**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KEVIN MILLER | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  21-49-MAK |
| | : | |
| TRIMONT  GLOBAL  REAL  ESTATE | : | |
| ADVISORS LLC | : | |

# MEMORANDUM
## with Findings of Fact and Conclusions of Law

**KEARNEY, J.**                                                    **February 28, 2022**

Experienced business executives charged with managing other persons' substantial real estate investments hopefully transact business in a forthright good faith manner. We expect them to deal in candor with each other, their clients, their Boards of Directors, and co-managers. We expect they honor contracts. We enforce their agreed contract terms relying on their good faith including deferring to a Board of Directors' discretion to end deferred compensation owed to a terminated at-will executive so long as the decision is not the product of fraud or bad faith.

The terminated at-will executive before us today signed deferred compensation agreements allowing his employer, if done properly, to end its deferred compensation contract obligation owed to him if the employer's Board of Directors fairly characterize the termination within several contractually defined examples of a "for cause" termination. The parties agreed "cause" would include, for example, materially injurious conduct to the employer or dishonesty. "Cause" is a specific finding beyond performance. The employer's Board found cause based on misleading information. The employer never paid the deferred compensation. The executive now sues for breach of contract. We evaluated the credibility of competing testimony surrounding his breach of contract claim seeking hundreds of thousands of dollars in deferred compensation during a bench

trial. Our evaluation of witness credibility and adduced evidence confirms the executive's conduct towards a co-manager in a dysfunctional relationship and his boss may warrant terminating him for cause immediately given the wide discretion afforded to the employer's Board of Directors.

But the Board's "cause" decision cannot be the product of a CEO's bad faith tactic of telling the Board one thing and the executive another. The employer's CEO induced the Board to approve his recommendation of "for cause" with partial information while encouraging the executive to stay with no loss of pay or title under a new reporting scheme. The CEO's plan would either: force the executive to resign based on a new reporting scheme after his employees could "cool off" and they could transition key clients; or, allow his former adversary co-manager to fire him for cause if he later fails to meet her performance standards. There is no evidence the Board knew the employer had an entirely different plan to induce the executive to work under a new reporting structure after it decided he should be terminated for cause. When the executive countered to the new structure, the employer abruptly characterized his counter as a resignation, blocked his computer and email access, and told co-workers of his departure without explanation. But it kept negotiating for him to resign. It never actually terminated him for cause; it just threatened to.

We defer to a contract's grant of broad discretion to the employer's Board determining "cause" so long as the Board decision is not a product of bad faith. The employer has every right to enforce its contract rights to terminate for cause. But it cannot achieve this end by misrepresenting its plan to first induce, and then abuse, the Board's "cause" decision as leverage. The CEO induced the Board to make one decision while he planned and effected another. His course of dealing confirms the Board's "cause" decision is a product of bad faith. We order

Defendant pay the demonstrated $ 450,647.00 value of the deferred compensation to the executive as detailed in findings of fact and conclusions of law:

## I.  Findings of adduced credible facts.

1.      Trimont Global Real Estate Advisors LLC owns companies which, among other things, manage substantial real estate investments for large investors.

2.      Trimont Global agreed to compensate newly recruited financial executive Kevin Miller with a $200,000 annual salary and deferred compensation represented by an award of phantom profit units governed by similar language in three unit agreements governing "A", "B", and "C" units.

3.      The parties agreed in the three unit agreements as to how Trimont Global would pay the deferred compensation and to the substantial deference given to Trimont Global's Board in interpreting the terms of compensation including when it could decline to pay the deferred compensation.

4.      The parties agreed Trimont Global did not need to pay deferred compensation if its Board in its exclusive discretion found a subsidiary terminated Mr. Miller for cause including willful misconduct or conduct injurious to Trimont Global.

5.      Kevin Miller and Terri Magnani co-managed a portion of one of Trimont Global's subsidiaries reporting to the subsidiary's President Mitchell Hunter.

6.      Mr. Miller enjoyed good relationships with several key clients.

7.      Mr. Miller and Ms. Magnani's relationship turned distrustful and Trimont Global grew dissatisfied with Mr. Miller's efforts.

8.      Mr. Miller knew of his increasingly limited role in client development compared to the increasing role of his new co-manager Ms. Magnani.

9.      Mr. Miller secretly sent Ms. Magnani's resume to one of Trimont Global's larger clients upon its request to fill a position within the client's business.

10.      Mr. Miller waited several days before telling Ms. Magnani he forwarded her resume to the client. His testimony is not credible explaining why he did not immediately tell Ms. Magnani of forwarding her resume to a client if, as he suggests, the client requested the information.

11.      The client directly contacted Ms. Magnani several days later much to her surprise. She responded by secretly sending her resume to the same client but asked the client not to tell anyone of her possible interest in the position.

12.      Ms. Magnani told President Hunter of the client's interest to employ her the next day. President Hunter became angry with Mr. Miller. Ms. Magnani decided she wanted to stay with the employer.

13.      President Hunter investigated the facts concerning Mr. Miller secretly forwarding Ms. Magnani's resume to the client.

14.      He decided, subject to Trimont Global's CEO Brian Ward's approval, to provide Mr. Miller with a final warning letter of discipline which would require him, among other things, to work in a subordinate position to Ms. Magnani but meet performance standards set by President Hunter before terminating him.

15.      President Hunter expressed concern with the effect of losing Mr. Miller upon Mr. Miller's client relationships.

16.      The final warning letter of discipline drafted by President Hunter did not require him to satisfy Ms. Magnani's expectations nor did the draft letter suggest the employer already decided to terminate him for cause with a loss of his deferred compensation.

17.     CEO Ward and President Hunter hoped Mr. Miller would "self select" and resign rather than adhere to this reporting structure, which subjected him to later termination for failure to perform, so they could smoothly transition Mr. Miller's clients before his departure.

18.     Trimont Global's CEO Ward also decided Mr. Miller's conduct may be grounds for a "for cause" termination.

19.     But he needed Board approval of the termination for cause. He told one of his two Trimont Global outside directors in a telephone call of his decision to terminate Mr. Miller for cause.

20.     CEO Ward did not tell the Board the whole story. There is no evidence Trimont Global's Board knew Mr. Miller would remain employed with the same title and compensation or of CEO Ward's ulterior motive to leverage the "cause" finding into restrictions leading to a forced resignation or termination after the employer could ensure a smooth transition of Mr. Miller's clients.

21.     Trimont Global's Board approved CEO Ward's recommendation without knowing of his plan for Mr. Miller to keep working under new reporting requirements and hoping he would "self select" to voluntarily resign or could be later fired at Ms. Magnani's discretion.

22.     Trimont Global's CEO Ward then directed his subordinates to revise the draft final warning letter to offer Mr. Miller a choice of working under a new reporting obligation including with performance reviews by his former co-manager Ms. Magnani.

23.     The final warning letter now gave Ms. Magnani the ability to review Mr. Miller's performance, and if she should find him deficient, the employer could then terminate him for cause based on the Board's approval based on incomplete disclosures.

24.     The final warning letter sent to Mr. Miller did not terminate him for cause but allowed him to continue to work for the employer even though CEO Ward had persuaded the Board grounds existed to terminate Mr. Miller "for cause."

25.     President Hunter immediately told Mr. Miller the final warning letter was not a demotion or a loss of pay or bonus and his employer would tell his associates Mr. Miller decided to step down from his busy roles to spend more time with family while he continued working for the employer.

26.     Trimont Global's CEO Ward's testimony is not credible as to the Board deciding to terminate Mr. Miller for cause as evidenced by his contradictory sworn statements before us, his sworn discovery responses later amended just weeks before trial on the eve of summary judgment motions, and his evident lack of candor to Mr. Miller and to the Board. CEO Ward did not disclose the employer's true plan of obtaining the "for cause" approval as back-pocket leverage for termination should Mr. Miller not perform to Ms. Magnani's satisfaction or to further coerce Mr. Miller into resigning while telling him his employer did not demote him or reduce his pay or bonus through the final warning.

27.     Mr. Miller offered a counter-proposal rather than work directly under his former co-manager Terri Magnani.

28.     Trimont Global interpreted the counter-proposal as Mr. Miller resigning consistent with its hopes he would resign.

29.     Trimont Global responded by cutting off his computer access and told his coworkers of his departure without notice to Mr. Miller.

30.     But Trimont Global then continued to offer resignation packages to Mr. Miller for over ten days, which he refused.

31.     Mr. Miller departed employment as of September 11, 2020.

32.     Trimont Global never lost a client, business associate (including Ms. Magnani), or business relationship due to Mr. Miller sending Ms. Magnani's resume to a client.

33.     Trimont Global never told Mr. Miller it actually terminated him for cause, or any reason for a termination "for cause" under the defined terms of the Unit Agreements until he sued.

34.     Trimont Global calculated the value of Mr. Miller's unit shares in response to this lawsuit:

| Class A Units | 20 units | 75% vested | $103,089.00 |
|---|---|---|---|
| Class B Units | 25 units | 100% vested | $138,106.00 |
| Class C Units | 20 units | 100% vested | $209,452.00 |
| Total | | | **$450,647.00** |

35.     Mr. Miller adduced no credible evidence of a higher value of these units.

36.     Trimont Global's calculation of the value of Mr. Miller's unit shares in the total amount of $450,647.00 is credible.

## II.   Conclusions of Law

37.     Mr. Miller's theory of the case is Trimont Global violated the express terms of the unit agreements because his conduct in forwarding Terri Magnani's resume to the company's client does not fit the contractual definition of "cause." He also contends Trimont Global failed to make the finding of cause consistent with the agreements.

38.     The elements of a breach of contract under Delaware law are: "(1) a contractual obligation; (2) a breach of the obligation by the defendant; and (3) a resulting damage to the plaintiff."[1]

39.     The unit agreements vest the three-member Trimont Global Board with the full and final authority in its sole discretion to interpret the provisions of the unit agreements, decide all

fact questions in applying its provisions, and make all determinations necessary or advisable for its administration.

40.    The issue is whether an August 24, 2020 telephone call where one outside director adopted CEO Ward's recommendation to terminate Mr. Miller for cause, notwithstanding the Board's authority, is a product of fraud or bad faith.[2]

41.    CEO Ward's use of the "for cause" language as leverage to force Mr. Miller to "self select" and resign resulted in him misleading his Board in bad faith resulting in the Board's decision to find "cause" even though CEO Ward and President Hunter did not want to immediately terminate him for these same grounds.

42.    Trimont Global did not intend to terminate Mr. Miller for cause and its later characterization of the termination as "for cause" demonstrates its bad faith.

43.    Trimont Global breached the unit agreements.

44.    We adopt Trimont Global's calculations of the value of Mr. Miller's unit shares absent credible evidence from Mr. Miller as to higher values.

45.    We order Trimont Global to pay $450,647.00 to Mr. Miller as deferred compensation for his unit shares under the unit agreements.

46.    There is no basis for discovery sanctions upon Trimont Global.

## III.    Analysis

We must determine whether the Trimont Global Board's termination of Mr. Miller "for cause" is in bad faith. We find the Board's articulated reasons to support its "for cause" termination of Mr. Miller are based on misinformation of the actual plan. Trimont Global's "for cause" determination is made in bad faith. Trimont Global breached the terms of its unit agreements. Trimont Global must now pay Mr. Miller for the demonstrated value of his unit shares.

### A.      Kevin Miller's deferred compensation in the unit agreements.

Trimont Global owns Trimont Holdings, LLC and First City Financial. Trimont Holdings in turn owns Trimont Real Estate Advisors LLC ("TREA") and several other Trimont-related entities.[3] TREA manages the real estate investments of its clients. Värde Partners, Inc. is an investment fund client of Trimont Global; it also owns 90.1 percent of Trimont Global.[4]

TREA hired Kevin Miller in early 2017. He began working for TREA in February 2017 as the Managing Director of its Underwriting Advisory group on an at-will basis.[5] TREA charged Mr. Miller with responsibility for business development, leading projects, managing and training staff, supervising approximately twenty employees, and assisting clients to evaluate and underwrite commercial real estate transactions through loans, debt, equity investments, and security investments.[6]

TREA agreed to pay Mr. Miller a $200,000 annual base salary and deferred compensation including units in Trimont Global under a Class A Units Management Phantom Profits Interest Plan ("Class A Units Agreement") and, in 2018, deferred compensation agreements with Trimont Global under a Class B Units Management Phantom Profits Interest Plan ("Class B Units Agreement") and Class C Units Management Phantom Profits Interest Plan ("Class C Units Agreement").[7]

Mr. Miller received twenty of the Class A units at the time of his hiring in 2017. He received twenty-five of the Class B units and twenty of the Class C units at his annual review in March 2018.[8] The Trimont Global Class A Units Agreement included a vesting period of twenty-

five percent of the quantity of units per year. As of September 1, 2020, Mr. Miller had vested seventy-five percent of his twenty shares of the Class A Units.[9]

The Trimont Global Class B and Class C Units Agreements did not have a vesting period like the Class A Units Agreement; Class B and C Units vested based on a future contingent event including termination without cause.[10]

The Trimont Global Class A, Class B, and Class C Units Agreements (collectively "Unit Agreements") differ in ways immaterial to our dispute but are consistent in requiring:

- Trimont Global  vest the units upon Mr. Miller's termination from TREA other than for "cause" as defined in the Class A, Class B, and Class C Unit Agreements. Termination for "cause" triggers an automatic forfeiture of all outstanding units;

- Trimont Global pay the cash equal to the Employee Termination Value of the units – defined as an amount equal to 0.01% of the Adjusted Värde Internal Mark Value reduced by the Base Value for such Class A, B, and C Units – to Mr. Miller within thirty days of his termination;

- Only Trimont Global's Operating Committee, or Board absent the Operating Committee, decide whether "cause" exists for termination from TREA;

- Mr. Miller  agreed to a non-solicitation of employees provision, providing "during his employment, and for a period of twelve (12) months following [his] Termination for whatever reason, that he shall not, whether directly or indirectly, and whether in his individual capacity or on behalf of any partnership, limited partnership, corporation or other entity or business with which he is in any way affiliated, including without limitation, as a partner, limited partner, member, director, officer, shareholder, employee, or agent of any such entity or business, (i) request, induce or attempt to influence, directly or indirectly, any employee of [TREA] to terminate his or her employment with [TREA] …; provided that the foregoing restrictions shall not apply to general employment solicitations not directed at [TREA] employees or the hiring of any former employee of [TREA] who was not solicited to leave or induced to leave the employment of [TREA] by [Mr. Miller].[11]

The Unit Agreements define key terms:

- "'**Cause**' … (B) in the case of any …. Participant, means, as determined by the **Committee**, the Participant's (i) willful misconduct or gross negligence in the performance of his … duties, or **Injurious Conduct**; . . . or (v) other material willful misconduct by which could reasonably be expected to be substantially injurious to the financial condition or business reputation of the **Company** of any

of its Subsidiaries (it being understood that the good faith performance by the Participant of an act at the specific request of an employee senior to the Participant will not constitute 'misconduct' for purposes of this clause (v))." [12]

- "'Committee' means the **Operating Committee** of the Company, as appointed by the **Board** or, if the Operating Committee ceases to exist and no successor committee has been appointed by the Board as the Committee to administer the Plan, the Board." [13]

- "'Company' means Trimont Global Real Estate Advisors, LLC …" [14]

- "'Board of Directors' or 'Board' means the board of directors of the Company." [15]

- "'Injurious Conduct' with respect to any Participant, means conduct of the Participant in the performance of his duties that (i) is objectively wrong or improper, including but not limited to fraud, embezzlement, theft, lying and obstruction of justice, and (ii) is materially detrimental to, or materially damages, the Company." [16]

- "'Värde Internal Mark Value' means, as of any date, the aggregate value of Värde's interest in the Company, as most recently determined quarterly by the Valuation Committee of Värde Management, L.P. and reported to Värde's investors." [17]

Termination for "cause" is determined by Trimont Global's Operating Committee as appointed by the Board of Directors of Trimont Global or, if the Operating Committee ceases to exist, by the Board of Trimont Global.

"Termination" means "the cessation of the Participant's employment (as an employee with the Company and all of its Subsidiaries" and the Operating Committee's (or Board's) "determination that a Termination occurred will be final, binding, and conclusive for all purposes upon all Persons." [18]

The definition of "Cause" does not include the "final, binding, and conclusive" language. "Willful conduct" is not defined by the Unit Agreements.

The Unit Agreements vest Trimont Global's Operating Committee (or Board if no Operating Committee exists) with "the power to adopt rules for carrying out the Plan to make

11

changes to such rules as it shall, from time to time, deem advisable. The Committee shall have the full and final authority in its sole discretion to interpret the provisions of the Plan and to decide all questions of fact arising in the application of the Plan's provisions, and to make all determinations necessary or advisable for the administration of the Plan. Any interpretation by the Committee of the terms and provisions of the Plan and the administration thereof, and all actions taken by the Committee, shall be final, binding, and conclusive for all purposes and upon all Persons."[19]

The Unit Agreements also contain a construction provision providing "[e]very covenant, term and provision of the Plan and any Award Agreement shall be construed simply according to its fair meaning and not strictly for or against the Company or a Participant. No provision of the Plan or an Award Agreement is to be interpreted as a penalty upon, or a forfeiture by, a party."[20]

**B.      Mr. Miller's conduct with Blackstone leads to discipline.**

Mr. Miller acted as the sole Managing Director of TREA's Underwriting Advisory team, one of four teams at TREA.[21]  TREA's President Mitchell Hunter supervised Mr. Miller.[22]

Mr. Miller lived in Dallas, Texas and Park City, Utah during the time he worked for TREA and travelled around the country meeting with clients. He had significant clients including Pine River and Granite Point, Blackstone, Torchlight, Basis Investment, Guggenheim, and Värde.[23]

***TREA's and Mr. Miller's relationship with Blackstone.***

Mr. Miller had a significant role working with Blackstone, a New York based private equity fund and client of TREA.[24] Blackstone has a debt and equity side of its business investing and buying real estate. On the debt side, Blackstone lent money to investors and owners who bought real estate or refinanced properties. TREA serviced the debt.[25]

In November 2019, TREA and Blackstone Real Estate Special Situations Advisors, LLC entered into a Servicing and Loan Administration Agreement ("Servicing Agreement").[26] Under

the Servicing Agreement, TREA dedicated certain of its employees to Blackstone's work; these staff members remained employees of TREA but worked at Blackstone either full-time or part-time as credit analysts and asset managers.[27] Under the Servicing Agreement, TREA and Blackstone agreed on "a list of [TREA] personnel to be assigned to provide [services] under the Agreement (the "Client Team") including the annual base salary … of such personnel, prorated as applicable for any personnel not serving on the Client Team on a full-time basis."[28] Blackstone had the option to interview candidates and hire for the Client Team and could "participate in the review process for all Client Team members and at [Blackstone's] request any such personnel may be removed from the Client Team" under the terms of the Servicing Agreement.[29]

Thomas Wise, a colleague of Mr. Miller and a Managing Director at TREA, managed the relationship between TREA and the Blackstone account, including sending resumes to Blackstone for review of dedicated team staffing positions.[30] TREA Managing Director Wise dedicated fifty percent of his work to Blackstone.[31] TREA Managing Director Wise sent resumes of candidates to Blackstone for its review. TREA sometimes hired new employees to fill positions for Blackstone and sometimes existing TREA employees filled positions at Blackstone.[32]

Mr. Miller worked with Jonathan Roberts at Blackstone under the Servicing Agreement.[33] Mr. Miller sent approximately thirty to fifty or more resumes of potential candidates to Blackstone for its review under the Servicing Agreement before August 2020, including existing TREA employees, some of which may not have known Mr. Miller provided their resumes to Blackstone.[34]

The Servicing Agreement did not contractually obligate TREA to provide resumes to Blackstone. There were no Trimont Global or TREA policies or provision in the Employee Handbook regarding the sending of resumes to Blackstone, including requiring permission to share

another employee's resume or detailing discipline if a TREA employee sent another employee's resume to a client like Blackstone.[35]

### *TREA's hiring of Terri Magnani as Mr. Miller's co-manager creates dysfunction.*

Trimont Global decided in 2019 to develop and grow its business in New York City.[36]  Mr. Miller learned Terri Magnani and a team of employees from Cushman & Wakefield in New York sought other opportunities. Mr. Miller referred Ms. Magnani's name to Trimont CEO Ward and TREA President Hunter.[37] CEO Ward considered Ms. Magnani a "critical part" of, and "absolutely essential" to, Trimont Global's strategy to grow its business in New York and, to that end, hired her and a team of six employees from Cushman & Wakefield to open an office in New York.[38] CEO Ward additionally considered hiring Ms. Magnani as a commitment to fairness and equality in the workplace for women.[39] TREA hired Ms. Magnani in June 2019 to co-lead its Investment Advisory Services Group with Mr. Miller.[40]

Mr. Miller expected Ms. Magnani would report to him but later learned Ms. Magnani would co-lead the Group with him; he found the way TREA communicated this development to him to be disappointing because he had not been given the opportunity for input into the decision to make Ms. Magnani a co-lead.[41] Mr. Miller estimated his ability to work with Ms. Magnani as a seven on a scale from one to ten,.[42]

Mr. Miller believed he had a greater ability to work with clients than Ms. Magnani. TREA President Hunter believed Ms. Magnani better at business development than Mr. Miller. Mr. Miller disagreed with TREA President Hunter's evaluation.[43]

Mr. Miller believed he lost all business development responsibilities by January 2020 to Ms. Magnani and another TREA employee in New York, John Grosso, whom he believed to be

14

"taking over [New York business development] as they are always there."[44] Mr. Miller believed TREA's new active presence in New York left him in "no man's land."

Mr. Miller complained about Ms. Magnani to TREA President Hunter who told Mr. Miller "he didn't want to hear it."[45] Ms. Magnani told Mr. Miller "no one liked him" in April 2020 and the two had a "heated exchange" over the phone regarding a client issue.[46] Mr. Miller often disagreed with Ms. Magnani and the two did not see "eye to eye." Mr. Miller believed TREA President Hunter gave the impression he favored Ms. Magnani.[47]

CEO Ward became concerned about Mr. Miller's unsatisfactory work performance before August 2020.[48] His concerns included: TREA required Mr. Miller to manage a team in Dallas, but he spent an increasing amount of time in Park City, Utah; the manager of the Dallas office reported Mr. Miller "was never around" and employees in Dallas felt like "he was always gone and were not receiving really any guidance from him."[49] Trimont Global Board Members James Dunbar and Brian Schmidt of Värde told CEO Ward of "growing increasingly concerned" that while they could trust Kevin Miller with underwriting deals," he "was becoming increasingly problematic and just couldn't – just couldn't be relied on" in terms of managing and growing the business.[50]

### Mr. Miller secretly sends Ms. Magnani's resume to Blackstone in August 2020.

TREA Managing Director Wise sent an email to Blackstone's Jonathan Roberts on July 14, 2020 in response to Mr. Roberts' request for a need to fill two positions at Blackstone: a junior underwriter to perform credit analysis and a senior person, "higher up or more versed in credit decision making (selling off positions or divesting of particular concentrations, etc.)."[51] TREA Managing Director Wise told Blackstone's Roberts Mr. Miller will send resumes for the two positions.[52]

Mr. Miller understood the Blackstone position would be a "dedicated" position – meaning 100 percent of the TREA employee's work would be for Blackstone – but knew TREA Managing Director Wise thought the position could go "either way" – meaning either 50 percent or 100 percent of the employee's time to Blackstone.[53] TREA Managing Director Wise and Mr. Miller earlier discussed Ms. Magnani's name as a potential Blackstone assign "a couple of times in conversation, but it was something [they] didn't discuss at length."[54]

Mr. Miller provided Blackstone's Roberts with a list of three candidates (not Ms. Magnani) for the senior role in an August 10, 2020 email and asked if he and Mr. Roberts could discuss the candidates.[55] Mr. Miller identified John Grosso, the New York TREA employee who Mr. Miller believed fit the Blackstone qualifications and who Ms. Magnani suggested as a possible candidate for the Blackstone senior position, in his first email to Mr. Roberts.[56]

Blackstone's Roberts and Mr. Miller spoke on Wednesday August 12, 2020 while Mr. Miller drove from Dallas, Texas to his new residence in Park City, Utah.[57] Blackstone's Roberts told Mr. Miller he did not have an interest in the three candidates suggested by Mr. Miller.[58] Blackstone's Roberts instead inquired about reviewing Ms. Magnani's resume for the senior position at Blackstone.[59]

Mr. Miller agreed to send Ms. Magnani's resume but asked Blackstone's Roberts to keep Ms. Magnani's resume confidential because Mr. Miller planned on speaking with Ms. Magnani at some point the same day while driving from Texas to Utah.[60] Mr. Miller emailed Ms. Magnani's resume to Blackstone's Roberts the next day upon arriving in Utah. Mr. Miller asked Blackstone's Roberts to "[k]eep confidential that I forwarded it to you even to her at this point."[61]

Mr. Miller did not call Ms. Magnani on the way to Utah. He sent the resume on August 13 and asked Blackstone to keep it confidential. Mr. Miller did not speak to Ms. Magnani between

Wednesday, August 12 and Monday, August 17, 2020. Mr. Miller attributes his inattentiveness in contacting Ms. Magnani for several days to having no opportunity to make the call during his long car ride from Texas to Utah and, once in Utah, having "a lot of stuff going on" and his focus on "get[ting] his new apartment in order."[62] Mr. Miller's testimony on this issue lacks credibility. He did not call Ms. Magnani even though he planned to do so in the several hour drive from Texas to Utah and for the several days thereafter. His "busy guy" excuse is not credible. The entirety of the evidence confirms Mr. Miller would prefer to have co-lead Ms. Magnani out of his way at TREA.

Blackstone's Roberts then asked Mr. Miller on August 17, 2020 about how he could contact Ms. Magnani. Blackstone's Roberts planned on including Ms. Magnani in a list of seven to ten candidates for the senior position at Blackstone.[63] Mr. Miller gave Blackstone's Roberts the contact information for Ms. Magnani. Mr. Miller still had not spoken to his co-lead Ms. Magnani about Blackstone's interest in her for its full-time senior position. Blackstone's Roberts called Ms. Magnani mid-day on August 17, 2020, when she learned for the first time Mr. Miller sent her resume to Mr. Roberts.[64]

Ms. Magnani texted Blackstone's Roberts after the call: "JR thank you again for the call. I will get my resume over tonight/tomorrow. If you don't mind my asking, did Kevin [Miller] and Thomas [Wise] suggest me for the position or to help you find someone? Lastly to confirm this is a [Blackstone] not [Trimont] position, correct?"[65] We find Ms. Magnani credible in swearing she did not know Mr. Miller forwarded her resume to Blackstone's Roberts at this time; she believed Mr. Miller and TREA Managing Director Wise suggested her to either find someone else or for her to fill the Blackstone need.[66]

Blackstone's Roberts responded to Ms. Magnani: "They mentioned you might be a good fit and would know people. I don't think they know whether it would be a Trimont or [Blackstone] (but it would be a [Blackstone] position)."[67]

Mr. Miller finally spoke to Ms. Magnani later in the day on August 17, 2020 (after Ms. Magnani's call with Blackstone's Roberts) to tell her he forwarded her resume to Blackstone.[68] Ms. Magnani described her reaction to Mr. Miller's action: she "[couldn't] even believe the idea would cross his head – mind. Even just telling me, mentioning to me would have been respectful, but to put my name in for a job when I co-lead the team with you, you keep saying mutual respect. I felt we had mutual respect until that moment" and felt offended.[69] Mr. Miller did not perceive Ms. Magnani to be upset; he characterized their August 17 telephone call as "cordial" and Ms. Magnani "seemed intrigued" about the opportunity at Blackstone.[70]

Consistent with Mr. Miller's perception, Ms. Magnani directly forwarded her resume to Blackstone's Roberts on the evening of August 17 but used her personal Gmail account rather than the TREA email address.[71] Ms. Magnani then texted Blackstone's Roberts the next day to confirm receipt: "I sent over my resume last night. [Please] keep [between] us, if asked please say I passed. [Thanks]."[72]

After sending her resume to Blackstone's Roberts, Ms. Magnani told TREA President Hunter the next day about her call with Blackstone's Roberts the night before and being "extremely upset" and concerned about the situation.[73] Ms. Magnani told TREA President Hunter she sent her resume to Blackstone's Roberts but did not have an interest in the position.[74] TREA President Hunter conceded he "was pissed off" and "agitated" with Mr. Miller after learning of this conduct on August 18.[75]

C.     **Trimont Global cannot identify when or why it terminated Mr. Miller for cause consistent with its Unit Agreements.**

CEO Ward and TREA President Hunter decided to investigate Mr. Miller's sending of Ms. Magnani's resume to Blackstone. CEO Ward delegated the investigation to TREA President Hunter.[76] On August 18, 2020, TREA President Hunter contacted several TREA officers to determine why Mr. Miller sent Ms. Magnani's resume to Blackstone without telling him, CEO Ward, or Ms. Magnani.[77] He did not contact Blackstone.[78]

TREA President Hunter told Mr. Miller he (President Hunter) was upset, he believed Mr. Miller's conduct constituted a "serious offense," and "getting to the bottom of what happened would be his number one priority."[79] Mr. Miller responded by forwarding six email threads between him and Blackstone's Roberts regarding Ms. Magnani.[80]

TREA President Hunter spoke with Managing Director Wise on August 19 for about five to ten minutes.[81] Mr. Wise denied being involved in sending Ms. Magnani's resume to Blackstone; admitted Ms. Magnani's name "came up" in conversation with Blackstone's Roberts for the Blackstone role; denied being aware Mr. Miller sent Ms. Magnani's resume to Blackstone; and claimed he "would never have done anything like that."[82] Trimont Global imposed no discipline upon Managing Director Wise for recommending Ms. Magnani to Blackstone.

TREA President Hunter consulted with Trimont Global executives Bill Sexton and Glen Peters but chose to forward only a portion of the emails to them.[83] TREA President Hunter sent Messrs. Sexton and Peters the email thread beginning with Mr. Miller's August 13, 2020, email: "Here is a copy of her [Ms. Magnani's] resume. Keep it confidential that I forwarded it to you even to her at this point."[84] But he did not forward the August 10 and 12 emails in which Mr. Miller initially proposed three candidates (and not Ms. Magnani) to Blackstone. Mr. Sexton

responded to the partial emails on August 18: "I have no words. What are you going to do?" TREA President Hunter replied: "Demote him [referring to Mr. Miller] and name Terri [Magnani] as head. He will then self select. He holds a key relationship with Pine River so need to get that agreement signed ASAP."[85] TREA President Hunter also called CEO Ward the same afternoon and recommended TREA "should probably get rid of" Mr. Miller.[86] TREA President Hunter told CEO Ward on several occasions on August 18 and 19 Mr. Miller lied to him about referring Ms. Magnani to Blackstone.[87]

After consulting with CEO Ward and at least two other Trimont Global executives based on partial information, TREA President Hunter finally spoke to Mr. Miller and Ms. Magnani together on August 20 to "address the issue between the two of them."[88] TREA President Hunter characterized the conversation as "calm" and "cordial."[89] TREA President Hunter's notes of his conversations reflect Ms. Magnani's concern "she was being forced out of the company." The notes also reflect Mr. Miller's denial he "referred" Ms. Magnani for a role at Blackstone. TREA President Hunter's notes also report his view Mr. Miller "changed his story to that he was doing what the client asked" and Managing Director Wise's confirmation Ms. Magnani's "name was mentioned" in connection with the Blackstone role but he "was not aware of the resume."[90]

TREA President Hunter decided he had all the facts he needed to decide Mr. Miller's discipline by August 18 or 19 after speaking to Ms. Magnani, Mr. Miller, Managing Director Wise for approximately five to ten minutes, and reviewing Mr. Miller's emails to Blackstone's Roberts. TREA President Hunter believed Mr. Miller lied when denying he "referred" Ms. Magnani's name to Blackstone but admitting Ms. Magnani's "name came up in a conversation"; he considered Mr. Miller's email to Blackstone's Roberts forwarding Ms. Magnani's email and asking Blackstone's

Roberts to "keep it confidential" as "undermining" Ms. Magnani; and, Mr. Miller never apologized to Ms. Magnani.

TREA President Hunter believed he had a Managing Director in Mr. Miller whom he "didn't trust." TREA President Hunter believed he "had no choice" but to discipline Mr. Miller.[91] TREA President Hunter contemplated whether to terminate or take disciplinary action less severe against Mr. Miller.[92] TREA executive Sexton asked TREA President Hunter on August 20: "Is there a gross misconduct clause in the share scheme?"[93] TREA President Hunter did not understand what Mr. Sexton meant by the "share scheme."[94] TREA President Hunter did not communicate with anyone about whether Mr. Miller's interest in the Unit Agreements could be taken from him under a misconduct clause because "that wasn't my thing. That's done at the board level with Global" and he "would not have participated in that decision" and "would not have been thinking about it at that point."[95] He forwarded a draft Final Written Warning to TREA executive Sexton for his advice the next day, commenting he "need[ed] [TREA General Counsel Steven Lauer] to help with the unit language."[96]

TREA President Hunter finalized a draft discipline final warning letter to Mr. Miller on August 21, 2020.[97] He chose to discipline rather than immediately terminate Mr. Miller. TREA President Hunter's draft August 21, 2020 Final Written Warning:

- Stated the purpose of the draft Final Written Warning is to bring to Mr. Miller's attention: (1) the forwarding of Ms. Magnani's resume to Blackstone without consulting Ms. Magnani or President Hunter. The draft Final Written Warning characterized the action as having "extremely undermine[d] [Ms. Magnani] and Trimont's strategic plan for the [Investment Advisory Services] business line"; and (2) his failure to be "forthcoming [with President Hunter] in disclosing your actions and made several comments that indicated you had not referred the said employee [Ms. Magnani]."[98]

- Advised as a consequence of his conduct, TREA would demote Mr. Miller from co-lead of the Investment Advisory Services to Senior Underwriter where Ms.

Magnani, now the sole lead of the Investment Advisory Services business line, would be his supervisor.[99]

- Outlined President Hunter's expectations for Mr. Miller to "***remain in good standing and not be terminated for cause***": "diligently and faithfully report" to Ms. Magnani and support her in the growth of the Investment Advisory Services business line; advance the Investment Advisory Services business line "with robust business development and service delivery"; advance two key clients "and other Trimont relationships"; and "such other tasks as we may ask of you in your [Senior Underwriting] role."[100]

TREA President Hunter's draft Final Written Warning did not mention terminating Mr. Miller or him losing Trimont Global units unless Mr. Miller failed to perform to these expectations to President Hunter's satisfaction which would then result in for cause termination with a "retroactive forfeiture of your Units" under the Unit Agreements.[101] Neither TREA nor Trimont Global sent the draft August 21, 2020 Final Warning Letter to Mr. Miller. President Hunter instead sent his draft Final Warning Letter to CEO Ward.

### CEO Ward's revisions to the Final Warning Letter after discussions with Mr. Dunbar of Trimont Global's Board.

CEO Ward wanted stronger language in the warning. He wanted a finding TREA had grounds to terminate Mr. Miller for cause immediately which would forfeit the Trimont Global units. CEO Ward believed TREA's investigation showed Mr. Miller wanted to "get rid of" Ms. Magnani and sought to accomplish her removal by sending her resume to Blackstone so it would hire her.[102] CEO Ward considered the resume incident "the granddaddy of all and one that just so thoroughly was injurious to the business and so thoroughly breached the trust of myself and the Board and the senior leadership, that it became apparent there was no further action – no other course to take than the one we did."[103] CEO Ward observed a "holistic" consideration of the "Injurious Conduct" provision of the Unit Agreements but also considered the provision defining

"cause" as "other material willful misconduct by which could reasonably be expected to be substantially injurious to the financial condition or business reputation" of Trimont Global.[104]

For cause termination triggers the forfeiture of Mr. Miller's units. But a determination of "cause" under the Unit Agreements is made by the three directors of Trimont Global.[105] So CEO Ward sought input from his two co-members of the Trimont Global Board. He spoke with Jim Dunbar of the investor Värde to discuss Mr. Miller's conduct in sending Ms. Magnani's resume to Blackstone.[106] In a call lasting approximately five minutes, CEO Ward told Mr. Dunbar Trimont Global "went forward with the termination."[107] CEO Ward also told Board Member Dunbar "they were going to let [Mr. Miller] go because of actions that he took regarding sending [Ms. Magnani's] resume to Blackstone."[108]

Board Member Dunbar considered Mr. Miller's termination "a decision for the executive management team at Trimont" and not his decision as a Board Member representing the investor Värde, but he believed the decision to terminate Mr. Miller under the circumstances "seem[ed] like the right choice."[109] While Board Member Dunbar could not explain how Mr. Miller's conduct "goes against the culture" of Trimont Global, he justified the for cause termination because: Mr. Miller sent Ms. Magnani's resume without informing her causing a loss of confidence in her at Trimont Global; he believed "there's probably some non-disparagement, potential non-solicitation points in there as well;" and the loss of confidence the executive managers had in Mr. Miller.[110] Board Member Dunbar did not know the definition of "cause" in the Unit Agreements and did not look at the Unit Agreements to determine the definition of "cause."[111]

Trimont Global adduced no evidence CEO Ward told his Board of his real plan: to allow Mr. Miller to continue working for TREA but then have, in his back pocket, the "for cause" determination from August 24, 2020 to terminate him when Ms. Magnani decided to do so for

performance reasons at some undefined future date after securing Mr. Miller's client relationships which TREA President Hunter feared would be placed at risk in a rapid termination. CEO Ward did not meet his duty of candor to the Board. His "for cause" determination is made in bad faith and then covered up by corporate machinations such as an "Unanimous Consent" prepared shortly before trial when counsel realized their deficiencies under the governing documents.

Board Member Dunbar then spoke with the third member of the Trimont Global Board, Brian Schmidt, for approximately five minutes to discuss Mr. Miller's actions. Board Members Dunbar and Schmidt did not specifically discuss the "cause" standard in the Unit Agreements but generally agreed with Trimont Global CEO Ward's decision to terminate Mr. Miller for cause.[112]

There is no contemporaneous record of the communications among Board Members Dunbar and Schmidt, and CEO Ward regarding Mr. Miller's for cause termination. But the three men ratified their decision by Board Resolution over a year later on October 22, 2021.[113] Board Member Dunbar cannot explain why the Board did not earlier confirm or ratify its decision to terminate Mr. Miller for cause.[114] CEO Ward did not speak with Board Member Schmidt on August 24, 2020.[115] Board Member Schmidt believed generally Mr. Miller "took some actions that were harmful to the business" by (a) promoting the solicitation of employees; and (b) lying to executives.[116] Board Member Schmidt verified his signature on the October 21, 2021 Board ratification but does not know where he was when he signed it; who he was with when he signed it; and does not remember when he first saw the document.[117] Board Member Schmidt has no recollection of Trimont Global's decision to terminate Mr. Miller for cause on August 24, 2020, an action he allegedly ratified on October 21, 2021.[118] Mr. Schmidt relied on CEO Ward's recommendation to terminate Mr. Miller for cause but does not remember specifics of CEO Ward's recommendation.[119]

Trimont Global also cannot adduce evidence of Board minutes, notice agendas, or meeting invites concerning a Board meeting in August or September 2020 to decide issues relating to Mr. Miller's employment. The only Board action is a Unanimous Consent created shortly before trial. Trimont Global CEO Ward's testimony is not credible on the October 2021 Unanimous Consent confirming his direction to his fellow Board members of his decision to terminate Mr. Miller. The Unanimous Consent appears contrived for purposes of this trial given several sworn discovery responses which do not disclose anyone other than CEO Ward decided the "for cause" necessary to forfeit the deferred compensation.[120]

***TREA President Hunter delivers a Final Written Warning to Mr. Miller on August 24, 2020.***

TREA President Hunter revised the draft Final Written Warning after CEO Ward's input. TREA President Hunter emailed the Final Written Warning to Mr. Miller just before an August 24, 2020 conference call with TREA President Hunter, Mr. Miller, and Human Resources Director Alicia Furlow.[121]

While the revised Final Written Warning supplemented the basis for the warning, President Hunter did not terminate Mr. Miller for cause as the Trimont Global Board directed on the same day.[122] President Hunter instead ignored the Board's direction to terminate Mr. Miller for cause and conditioned Mr. Miller's performance of Trimont Global's expectations of him to the satisfaction of Ms. Magnani and not TREA President Hunter, as in the draft document.[123] Contrary to the Board's direction, Trimont Global decided to negotiate to keep Mr. Miller employed for unknown reasons subject to certain conditions more consistent with TREA President Hunter's idea of demoting Mr. Miller and then allowing him to "self select" and resign. Although CEO Ward overruled TREA President Hunter and told his Board members of the intent to terminate Mr. Miller for cause (as the governing documents allow him to do), Trimont Global then shifted without

explanation and stated its willingness to "refrain from" for cause termination subject to Mr. Miller's agreement to satisfy certain conditions. CEO Ward (contrary to his Board representations) decided to give Mr. Miller the "opportunity for corrective action" with a "significant opportunity to come to be self-aware, to be mature, to apologize with respect to the gravity of his actions."[124] He "embedded inside of the final warning … an opportunity for [Mr. Miller] to remain at the company and ultimately for me to allow the situation to cool off. And with my calculated desire to see the situation cool off, which is why the final warning was drafted in the way that it was."[125]

The August 24, 2020 Final Written Warning did not reference a Trimont Global or TREA policy violated by Mr. Miller nor did it explain how his actions constituted good cause. The Final Written Warning directed changes "will" occur as of August 24 including: while Mr. Miller will remain employed with the same Managing Director title and compensation, TREA removed him as a co-lead of the Investment Advisory Services and instead required he report to Ms. Magnani as the senior member of the team.[126] And Ms. Magnani could terminate him for cause if he failed to perform to her satisfaction moving forward. TREA asked Mr. Miller to agree to these terms. TREA offered him no choice.  Changes are made and he can agree to them.

After meeting with Mr. Miller on August 24, 2020, TREA President Hunter texted Mr. Sexton: "Call with Kevin [Miller] was fine. He didn't say much but wanted to review the letter some more. He said he was taken back and this was unexpected. I told him we took this very seriously and that hasn't changed from last week."[127]

TREA President Hunter confirmed no termination to Mr. Miller on August 24 or 25. As Trimont Global admits, TREA President Hunter "called Mr. Miller twice on two occasions on August 24, 2021 or August 25, 2021 to tell him they weren't demoting him, weren't changing his base compensation or bonus structure, and would tell other TREA employees he was stepping

26

down form advisory co-head role to spend more time with family by not having the burdens of traveling for business development, managing a team, or being a member of the Global Advisory Council so as to not embarrass [Mr.] Miller. [TREA President] Hunter told [Mr.] Miller during the call that he could recover from this incident and could again regain [TREA President] Hunter's trust again."[128]

TREA President Hunter told Mr. Miller an entirely different story than CEO Ward told the Board of Directors to obtain the "for cause" termination. We credit TREA President Hunter's representations to Mr. Miller and find CEO Ward not credible in his changing explanations. CEO Ward induced the Board in bad faith to obtain the "for cause" approval without telling the Board he did not intend to terminate Mr. Miller for cause but would instead work with him and place reporting requirements on him to either obtain their trust again or have him "self select" and resign.

### *Trimont Global construes Mr. Miller's counteroffer as a resignation.*

Mr. Miller believed the conditions required of him to keep his position at TREA to be an attempt to force him to resign.[129] Mr. Miller asked TREA President Hunter for time to respond to the Final Written Warning.[130]

TREA President Hunter and Mr. Sexton continued texting about Mr. Miller through August 25, 2020 when TREA President Hunter texted, on the evening of August 25, 2020: "I have reached out to Kevin to dismiss the letter and he hasn't responded. I'm getting pissed and may just fire him."[131] TREA President Hunter, contrary to CEO Ward's direction to Trimont Global's Board and alleged decision, did not think TREA terminated Mr. Miller as of August 25, 2020.

Mr. Miller scheduled a phone call with TREA President Hunter and Human Resources Director Furlow for August 27, 2020 to discuss Mr. Miller's response to the August 24, 2020 Final

Written Warning.[132] While waiting for TREA President Hunter and Human Resources Director Furlow to join the call, Mr. Miller noticed TREA severed his access to TREA's network.[133]

Mr. Miller responded to the Final Warning Letter in writing on August 27, 2020.[134] Mr. Miller's response proposed: he would waive all rights to litigation; agree not to directly seek employment or contract services with three competitors for a period of two years; agree to continue to advocate for TREA and "look for ways to help strengthen the Company's footprint within its current services lines; a mutual non-disparagement clause in exchange for Trimont Global withdrawing the Final Warning Letter and not including it in Mr. Miller's personnel file; immediate vesting of Class A, Class B, and Class C shares; payment of 180 days' wage and health coverage, accrued paid time off; and Trimont Global would release Mr. Miller from the restrictive covenants with certain exceptions.[135] Mr. Miller did not resign.[136]

TREA did not appreciate Mr. Miller's counter. After receiving Mr. Miller's August 27, 2020 response, TREA President Hunter and Mr. Sexton texted each other:

TREA President Hunter: "Letting Kevin go. He came back with a not so good response."

Mr. Sexton: "What did he come back with? What an idiot."

TREA President Hunter: "Wanted a separation and all his units paid out then wouldn't take legal action" and "He isn't 100% vested."

Mr. Sexton: "What legal action??"

TREA President Hunter: "Exactly."

Mr. Sexton: "Idiot." "Do we need to pay any of them out?" [referring to unit shares] "I'm sorry it worked out this way. You try and do the right thing and these people then throw it back in your face. I'm sorry for you pal."

TREA President Hunter: "Thanks, we will probably pay something out but not full shares."[137]

28

CEO Ward directed Mr. Miller's access to TREA's computer system to be severed on August 27 or August 28, 2020.[138] TREA blocked Mr. Miller's access to his work email the next day.[139]

TREA President Hunter sent an mail to "All Trimont Employees" on September 1, 2020 notifying them "effective today" Mr. Miller "is no longer with Trimont" and all client inquiries should be referred to either TREA President Hunter or Ms. Magnani.[140] CEO Ward did not view the September 1, 2020 email as Mr. Miller's termination date; he instead characterized the status of Mr. Miller's separation from the company as "a very complex question" and whether he resigned as of September 1, 2020 "involved a lot of complexity."[141] In CEO Ward's view, Mr. Miller's employment "really came to an end … in, end of August maybe early September when it because became clear that the differences became irreconcilable."[142] CEO Ward concluded as of September 1, 2020, Mr. Miller and TREA were "back at door number 1" – termination for cause – rather than "door number 2" – the opportunity to remain employed and keep his units.[143] CEO Ward also did not think TREA had fired Mr. Miller days after he told Trimont Global's Board of the necessity to do so "for cause."

CEO Ward swore he tried to accommodate Mr. Miller's counterproposal ("door number 3"): "we were trying to work inside of the confines of door number 3 and find some acceptable solution. When we got to around the 1st of September, it became clear that we were just on different planets and that was not going to happen, which then ultimately, it resulted in us capitulating and saying we're back to door number 1" because "we couldn't sort out a door number 3 solution for [Mr. Miller]" … "[s]o we were back at termination for cause."[144] CEO Ward testified "by the time [TREA President] Hunter had sent [the September 1, 2020] email, I think we had then reached the logical conclusion that we were back at door number 1."[145]

But whatever conclusion CEO Ward now recalls from August and September 2020, his subordinates continued to try and resolve the future relationship with Mr. Miller. As of September 1, 2020, Mr. Miller had not resigned and did not receive a communication terminating him.[146] Trimont Global's General Counsel Steven Lauer responded to Mr. Miller's August 27, 2020 proposal on September 1, 2020.[147] General Counsel Lauer's letter rejected Mr. Miller's August 27, 2020 "counteroffer," characterizing it as an offer to resign. General Counsel Lauer confirmed TREA did not terminate Mr. Miller on August 24: "…in light of your prior service to the company we offered you a different but still important role in Investment Advisory Services retaining the title of Managing Director (but no longer head of IAS) and without a change in compensation." [148] Counsel Lauer clarified TREA would "as a gesture of good faith" accept Mr. Miller's resignation as of September 1, 2020, pay him accrued but unused paid time off and the value of his seventy-five percent vested interest in his Class A Units only if he executed a standard release.[149] General Counsel Lauer asked Mr. Miller to let him know whether Mr. Miller accepted the September 1, 2020 offer.[150] General Counsel Lauer never mentioned TREA President Hunter's email to all employees announcing Mr. Miller's departure.

On September 9, 2020, General Counsel Lauer again sent a letter to Mr. Miller.[151] General Counsel Lauer characterized his September 1, 2020 letter as an offer to accept Mr. Miller's resignation rather than a termination for cause. General Counsel Lauer asked Mr. Miller to confirm he accepts the September 1, 2020 offer by 5 p.m. on September 11, 2020. If Mr. Miller did not confirm acceptance by September 11, 2020, Trimont Global will withdraw its offer and proceed with termination for cause.[152] General Counsel Lauer's September 9, 2020 letter makes no sense if, as CEO Ward would like us to believe, he decided to terminate him for cause by August 24, 2020 and the Trimont Global Board agreed with him on August 24, 2020. No TREA or Trimont

Global witness explains how the Board could both terminate Mr. Miller for cause on August 24, 2020 but then offer him a position in the company, and then consider him as resigning a week later when he never resigned. TREA cannot dictate Mr. Miller's resignation as much as it tried.

Trimont Global never specified a reason for good cause as defined by the Unit Agreements for terminating Mr. Miller. Its last letter spoke of a termination for cause in the future: "we will proceed with a termination for cause."[153] CEO Ward's contradictory testimony confirms Trimont Global and TREA are still not sure: he first testified at trial Mr. Miller resigned and then later characterized his departure as a termination for cause.[154]

Mr. Miller's attorney responded to Trimont Global's September 9, 2020 letter seeking to enforce rights under the Unit Agreements.[155] Mr. Miller never received a communication from Trimont Global after September 9, 2020 advising of a for cause termination.[156] Mr. Miller never received his deferred compensation under the Unit Agreements. TREA terminated Mr. Miller as of September 11, 2020 consistent with General Counsel's Lauer's representations on September 9, 2020 although we still do not know whether TREA ever proceeded with a termination for cause.

### D. Trimont Global acted in bad faith in denying deferred compensation.

Mr. Miller negotiated the Unit Agreements giving the Trimont Global Board the authority to fire him "for cause." He now sues arguing Trimont Global Board's decision to not pay him under the Unit Agreements is in bad faith and warrants an award of the value of his Units. He argues Trimont Global breached specific written terms in the Unit Agreements. Mr. Miller chose not to pursue a claim for the implied covenant of good faith and fair dealing. We cannot craft this claim for him given his repeated insistence on a claim based on a breach of the Unit Agreements.[157]

Termination for cause as defined by the parties in the Unit Agreements is limited to defined employee conduct such as dishonesty or injurious conduct. It rises to the level warranting

immediate termination and loss of deferred compensation owed under the Unit Agreements. We enforce the terms of Trimont Global's and Mr. Miller's Unit Agreements. Mr. Miller agreed Trimont Global's Board had wide discretion. The Unit Agreements vest the Board with "full and final authority in its sole discretion to interpret the provisions of the Plan and to decide all questions of fact arising in the application of the Plan's provisions, and to make all determinations necessary or advisable for the administration of the Plan. Any interpretation by the Committee of the terms and provisions of the Plan and the administration thereof, and all actions taken by the Committee, shall be final, binding, and conclusive for all purposes and upon all Persons."[158]

Trimont Global and Mr. Miller dispute the discretion given to the Trimont Global's Board to determine whether Trimont Global could terminate him for cause under the Unit Agreements. Trimont Global argues we may not "second guess" its Board's decision absent a showing of fraud or bad faith. Trimont Global relies on *W.R. Berkley Corp. v. Hall*[159] in support of its argument. In *W.R. Berkley*, a former employer sought to recapture profits its former employee received under a stock option plan after the employer's stock option committee determined the former employee accepted a new job with a competitor in violation of the plan.[160] The stock option plan delegated all decisions to the stock option committee, including to construe and interpret the plan and "all decisions, determinations and interpretations of the Committee shall be final and binding on all Optionees."[161] The former employee argued his former employer failed to act in good faith in determining his new employer is a competitor and the recapture provision is an unenforceable penalty. The court rejected the former employee's argument, finding the plan vested the stock option committee with final, binding and conclusive authority to determine a participant's right to receive or retain benefits and a court may not "second guess" its decision absent a showing of fraud or bad faith.[162]

Mr. Miller argues the Unit Agreement language giving the Board sole discretion to interpret the Unit Agreements and decide all fact questions in the application of the Unit Agreements does not mean the Board's for cause termination decision is unreviewable.[163] Mr. Miller argues the Board's decision to terminate him for cause is reviewable under an "arbitrary and capricious" standard.[164] This standard is typically found in employee benefit plans governed by ERISA.[165] Trimont Global does not argue its Board decision is unreviewable; it concedes we may review the decision under a fraud or bad faith standard. Mr. Miller does not provide us with an explanation how the bad faith standard differs from the abuse of discretion/arbitrary and capricious standard here. He does not distinguish the *W.R. Berkley* case cited by Trimont Global. He instead relies largely on authority applying the arbitrary and capricious standard to ERISA plans not applicable here.

We agree with Trimont Global as to our deference in reviewing the Board's discretion in reviewing a private contract between an employer and its executive. We are persuaded by judges interpreting Delaware law to enforce the terms of the contract granting the Board wide discretion subject only to being invalidated by a showing of fraud or bad faith.[166]

Mr. Miller and Trimont Global parry over whether Mr. Miller's conduct warrants termination in the first place. Mr. Miller seemingly wants to excuse his conduct. But he admits the at-will nature of his TREA position. We are not venturing into an analysis of whether his sending Ms. Magnani's resume to Blackstone is materially injurious or the honesty of his representations to TREA President Hunter. TREA President Hunter and CEO Ward are fully vested and capable of making those determinations and we will not second guess their view.

We do not dispute the decision to discipline Mr. Miller. We do not dispute TREA could terminate Mr. Miller as an at-will employee based on its officers' perception of his diminishing

performance, his lack of candor to Ms. Magnani, and the effect Mr. Miller's conduct may have on their New York initiatives with the newly recruited Ms. Magnani and her team. They could have fired him on August 21. But our analysis goes one step further under the Unit Agreements. The parties agreed Trimont Global's Board (absent its Operating Committee) needed to find the level of "cause" necessary to walk away from the contracted deferred compensation obligation. CEO Ward seemingly did not understand his limited authority in this decision as he repeatedly swore he made the decision with no reference to the Board. CEO Ward testified he called co-director Dunbar and essentially told him he planned to fire Mr. Miller for cause.

Trimont Global went a step further to try to buy time to protect TREA's relationship with Mr. Miller's contacts in other key clients. Both TREA President Hunter and CEO Ward expressed anger at Mr. Miller. Mr. Miller's conduct may have been the "last straw" in their tolerance of his performance failings given their preference for Ms. Magnani. President Hunter confirms looking for a cooling-off period. An eventual resignation buys time. CEO Ward and TREA President Hunter agreed to remove Mr. Miller as the co-head of the Investment Advisory Services but retain the same compensation and Managing Director title. They both hoped he would "self select" and resign rather than live under their new reporting obligations including, after CEO Ward's input, granting Ms. Magnani the performance review authority over Mr. Miller.

Trimont Global's CEO decided to ramp up the leverage and characterize the conduct as rising to the level of "for cause" termination under the Unit Agreements. He did so without knowing of whether TREA suffered a single dollar loss or reputational harm. As he repeatedly swore in discovery responses and notwithstanding a later lawyer-created trial exhibit, CEO Ward made this decision himself. He decided to use the "cause" threat to further coerce a resignation: Mr. Miller could either resign or work under Ms. Magnani's performance review with the ever-

present risk of eventually being terminated presumably at her whim because he agreed to those terms when faced with this induced "for cause" decision. CEO Ward explained his decision to his Trimont Global Board member Dunbar who deferred to him in finding a "cause." There is no credible evidence CEO Ward told the Board about his plan to use the "cause" determination in a manner which would keep Mr. Miller working at TREA with the same title and compensation. CEO Ward's plan allowed for Mr. Miller to continue working for TREA but under a new reporting obligation. His plan, candidly described by TREA President Hunter, was to secure Mr. Miller's relationships with valued TREA clients before he would "self select" and resign. There is no evidence CEO Ward told the Trimont Global Board of his leverage tactic. Even the "unanimous consent" created by Trimont Global's counsel on the eve of trial confirms CEO Ward did not tell the Trimont Global Board of this plan.

Trimont Global, through its CEO Ward, acted in bad faith by failing to tell the whole truth to his Board on August 24, 2020. He then compounded the bad faith by directing TREA officers to shut down Mr. Miller's computer access and e-mails and consider him "resigned" when he did no such thing. Trimont Global CEO Ward and TREA President Hunter accomplished their goal of a "resignation" even when Mr. Miller never resigned. Trimont Global's bad faith is further evidenced by its failure to ever retreat from its August 24, 2020 assurance "in light of past service, the company is willing to refrain" from terminating him for cause "at this time subject to your agreement to satisfy, and your satisfaction of all of the conditions" which TREA then described.[167] Trimont Global's bad faith is further evidenced by its September 1 to September 9, 2020 insistence on a phony resignation when it never offered resignation in its August 24, 2020 warning letter and only mischaracterized Mr. Miller's counteroffer as "resignations."

Trimont Global, even during CEO Ward's trial testimony, could not decide on when and why Mr. Miller departed. It never issued a termination letter. The last communication between TREA and Mr. Miller phrased the termination for cause in the future: "if you do not confirm acceptance by [5 p.m. September 11, 2020] our offer with be withdrawn…and we will proceed with a termination for cause."[168] Mr. Miller did not accept TREA's offer and never agreed to resign.[169] TREA never sent another document to Mr. Miller following TREA's September 9 final offer.[170] CEO Ward swore TREA "terminated" Mr. Miller after he refused to accept TREA's final offer.[171]

Trimont Global used a proper discipline measure but then abused its Board to induce a bad faith determination of cause necessary to forfeit the deferred compensation. The parties' agreed deference to the Trimont Global's Board discretion does not include omissions to the Board and use of a specifically defined "cause" finding as leverage to coerce a resignation. The entirety of the evidence after evaluating the credibility of the witnesses confirms Trimont Global acted in bad faith by misleading the Board based on a perceived "cause" ground to force Mr. Miller to resign to protect his investment in Ms. Magnani and the New York initiatives led by her and punish him by eliminating deferred compensation. It did not intend to terminate Mr. Miller and misrepresented this fact to the Board in bad faith to induce the cause finding to hold in its back pocket when it could transition client relationships and more conveniently fire Mr. Miller based on Ms. Magnani's performance review with Mr. Miller agreeing to then retroactively forfeit his deferred compensation based on his earlier sending of Ms. Magnani's resume to Blackstone. He would, under CEO Ward's and TREA President's Hunter's plan, be expected to fulfill his obligations to clients with the sword of instant termination held by Ms. Magnani over his head at any time . There is no evidence the Board approved this tactic. CEO Ward induced the Board's "for cause" decision

with misinformation while his subordinates including General Counsel and President furthered the actual plan to keep Mr. Miller until he resigned, or Ms. Magnani could fire him for later performance deficiencies. We find Trimont Global offers no credible evidence to rebut this evident bad faith.

### E.   Trimont Global must pay Mr. Miller the demonstrated value of his unit shares.

Mr. Miller bears the burden of demonstrating his damages. The formula to determine the value of Mr. Miller's phantom profit units at the time of termination under the Unit Agreements are identical:

> In the case of [Class A Units/Class B Units/Class C Units] that are settled in connection with the Participant's Termination prior to a Transaction, each [Class A Unit/Class B Unit/Class C Unit] represents the contingent right to received, upon Termination (and subject to al the terms and conditions of the Plan and the applicable Award Agreement), and amount equal to 0.01% of the Adjusted Värde Internal Mark Value, <u>reduced</u> (but not below zero) by the Base Value for such [Class A Unit/Class B Unit/Class C Unit] (the "[Class A/Class B/Class C]" Unit Employee Termination Value.[172]

The "Adjusted Värde Internal Mark Value" is defined as: "as of any date, the Värde Internal Mark Value (i) increased to reflect the equity interests of all Investors, so that the Company is valued as a whole, and (ii) (A) increased by the aggregate amount payable under the Plans, and (B) decreased by the portion, if any of the [Class A Units/Class B Units/Class C Units] participation Threshold that has not previously been paid to the Members at Distribution.[173]

Trimont Global's Chief Financial Officer Glen Peters reports Trimont Holding's financial information to Värde monthly. It is a consolidated report and does not break out information for TREA.[174] CFO Peters only receives Värde's internal mark value in the event of an employee

termination. CFO Peters is not involved in calculating Värde's internal mark.[175] As of the time of our December 2021 trial, the last time Värde provided Trimont Holdings with its internal mark value would have been June 2020 because Mr. Miller separated from TREA in September 2020.[176] The June 2020 internal mark would have been used for Mr. Miller's valuation. The June 2020 internal mark was approximately $3 million lower than the January 2020 internal mark which reported results before the worldwide pandemic.[177]

Värde's Mr. Dunbar provided Trimont Holdings with a spreadsheet showing the monthly history of the adjusted Värde internal marks and the internal marks from January to September 2020 used for the calculation of Mr. Miller's unit shares if Trimont Global had paid him his unit shares.[178] Värde prepared an underlying share Unit Plan model, updated periodically to determine unit values as needed.[179]

CFO Peters prepared a reconciliation to show the value for each Class A, Class B, and Class C Units share.[180] CFO Peters calculated the value of Mr. Miller's unit shares:[181]

| Class A Units | 20 units | 75% vested | $103,089.00 |
|---|---|---|---|
| Class B Units | 25 units | 100% vested | $138,106.00 |
| Class C Units | 20 units | 100% vested | $209,452.00 |
| Total | | | **$450,647.00** |

Mr. Miller adduced no credible evidence of the value of his units. His challenges are wholly based on speculation. He did not appear to obtain the level of discovery necessary to forensically challenge CFO Peters's calculations. We find CFO Peters's calculations of the value of Mr. Miller's unit shares in the total amount of $450,647.00 credible.

### F.    Trimont Global must pay pre-judgment and post-judgment interest.

Pre-judgment interest in breach-of-contract cases is awarded as a "matter of right."[182] Pre-judgment interest "accumulates from the date payment was due the plaintiff, because full

compensation requires an allowance for the detention of the compensation awarded and interest is used as a basis for measuring that allowance."[183]

"The 'legal rate of interest has historically been the benchmark for pre-judgment interest.'"[184] Delaware judges award pre-judgment interest at the statutory rate.[185] The statutory rate is "5% over the Federal Reserve discount rate including any surcharge thereon or the contract rate, whichever is less."[186] Our broad discretion in fixing the interest rate includes the authority to award compound interest, and "compound interest is a more accurate means of measuring the time value of money."[187] We find compound interest on an annual basis is the appropriate measure of interest.

TREA terminated Mr. Miller as of September 11, 2020. The parties agreed Trimont Global must pay the deferred compensation within thirty days of termination.[188] The discount rate is currently 0.25%, so the post-judgment interest rate is 5.25%.[189] Trimont Global must pay 5.25% interest on the deferred compensation from September 11, 2020 to February 28, 2022. We award $32,971.59 in pre-judgment interest compounded annually.[190]

Trimont Global is also responsible to pay post-judgment interest from today until it satisfies the judgment including the $32,971.59 in pre-judgment interest. Judgments "shall, from the date of the judgment, bear post-judgment interest of 5% over the Federal Reserve discount rate including any surcharge thereon or the contract rate, whichever is less."[191] This statute applies to "cases at law" in Delaware.[192] The amount to which the post-judgment interest is awarded must include "both the amount of the judgment and the amount of prejudgment interest."[193] We must award post-judgment interest of 5% above the Federal Reverse discount rate from the date we enter judgment.[194] The discount rate is currently 0.25%, so the post-judgment interest rate is

5.25%. Trimont Global must pay 5.25% post-judgment interest compounded annually on $483,618.59 from today until it satisfies the Judgment.

**G.      We find no basis to sanction Trimont Global for discovery conduct.**

Mr. Miller requests we impose sanctions upon Trimont Global after trial for CEO Ward's changing testimony as to the Board decision, the belated creation of the Unanimous Consent, and possibly not producing financial information. We deny his request.

Mr. Miller moved for sanctions arising from Trimont Global's last minute change in position including creating the October 2021 Unanimous Consent.[195] We granted relief requiring additional discovery and allowing Mr. Miller to again depose witnesses with Trimont Global solely responsible for the additional discovery costs.[196] He offers no credible evidence of present prejudice warranting further sanction. We evaluated the credibility of Trimont Global's evidence partially affected by the changing testimony proffered by CEO Ward.

Mr. Miller also argues Trimont Global did not produce all documents relating to his burden to show the unit share values calculated by its third-party investor Värde. Mr. Miller did not move to compel this information. He did not offer evidence of a subpoena for these records. He deposed Värde representatives and admits Director Dunbar can be found in Minnesota.[197] We cannot sanction Trimont Global for alleged discovery obstruction absent proof it obstructed. We deny Mr. Miller's requests for sanctions.

## III.   Conclusion

We expect co-manager executives, even those in a dysfunctional competitive client development environment with each other, to be honest in their dealings. We defer to a Board of Directors' contracted-for broad discretion in reliance on their honest dealings. The executives at the center of today's disputed breach of contract issue do not meet this standard.

Trimont Global had the right to terminate Mr. Miller's at-will employment. It also had the right to terminate its obligations to pay deferred compensation upon its Board finding "cause" for termination. Trimont Global argues its Board's decision cannot be challenged unless we find fraud or bad faith. We agree with Trimont Global's analysis of Delaware Law.

But inducing a Board finding of "cause" through nondisclosure of the employer's real plan is bad faith. Trimont Global's CEO and TREA's President concocted a plan to use the "cause" threat to both have as back pocket leverage to later terminate him and to coerce Mr. Miller to continue working without a loss of salary, bonus, or title to allow the parties to "cool off" and be able to more efficiently ensure a transition of services to his key clients. Trimont Global adduced no evidence CEO Ward told the Board of his ulterior motive and plan already in action. The limited credible evidence of an August 24, 2020 Board decision never mentions the idea of Mr. Miller continuing to work for TREA. CEO Ward presented half the facts to the Board as he always intended to keep Mr. Miller around for at least some period. CEO Ward's testimony is not credible as to his failures of candor. We expect he could ask the Board for approval of a "for cause" finding which he would not announce until later.  But there is no evidence he raised the issue of Mr. Miller staying with TREA at all.  He said one thing to the Board and another to Mr. Miller.  The lack of candor is further confirmed by TREA's President telling Mr. Miller the final warning letter sent after the Board's "cause" decision did not change their view he was not demoted, did not lose pay or bonus, and had the opportunity to earn his trust back while continuing working. General Counsel Lauer confirmed the plan in his September 1, 2020 letter. The admitted plan is contrary to CEO Ward's statements to Trimont Global's Board persuading it to find a "for cause" termination. When Mr. Miller countered with a proposal for his departure, Trimont Global and TREA decided to cut off his access and characterize his delay as a "resignation." Trimont Global's CEO decided

the "for cause" in bad faith and then presented incomplete and misleading information to the Board to induce the leverage he wanted as a threat over Mr. Miller's ongoing obligations while buying time for TREA to transition the client service.  CEO Ward is not credible is attempting to conflate the agreed discipline with a "for cause" finding by the Board.

Mr. Miller offers no competent evidence contradicting Trimont Global's valuation of his units. We order Trimont Global to pay $450,647.00 under its Unit Agreements plus $32,971.59 in pre-judgment interest. Trimont Global is also responsible for post-judgment interest on the $483,618.59 judgment. It is not responsible for Mr. Miller's requested sanctions.

---

[1] *Hydrogen Mast Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 333 (D. Del. 2017) (quoting *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003)).

[2] *W.R. Berkley Corp. v. Hall*, 2005 WL 406348, at * 4 n. 13  (Del. Super. Feb. 16, 2005) (collecting cases).

[3] D.I. No. 146, Notes of Testimony ("N.T.") at 8–10. No one disputes TREA offers asset management services to commercial real estate lenders and investors around the world.

[4] D.I. No. 146, N.T. at 115.

[5] D.I. No. 145, N.T. at 157–59.

[6] *Id.*, N.T. at 17, 157–59.

[7] D.I. No. 145, N.T. at 13; Joint Exhibits 3, 6, 7.

[8] D.I. No. 145, N.T. at 13–14.

[9] D.I. No. 146, N.T. at 24; Joint Exhibit 3 at 15–16.

[10] D.I. No. 146, N.T. at 27–28; Joint Exhibit 6 at 15, Joint Exhibit 7 at 9.

[11] Joint Exhibit 3 at 24; Joint Exhibit 6 at 24, Joint Exhibit 7 at 24.

[12] Joint Exhibits 3, 6, 7 § 2.h. (emphasis added).

[13] *Id.* § 2.m. (emphasis added).

[14] *Id.* § 2.n.

[15] *Id.* § 2.g.

[16] *Id.* § 2.t.

[17] Joint Exhibit 3 § 2.ll; Joint Exhibit 6, § 2.mm; Joint Exhibit 7 § 2.oo.

[18] Joint Exhibits 3, 6, 7 at ¶ 2.ff.

[19] *See e.g.* Joint Exhibit 3 at ¶ 6.c.

[20] *See e.g.* Joint Exhibit 3 at ¶ 12.h.

[21] The Underwriting Advisory team is also known as "Investment Advisory Services," or "IAS" team. The other three teams are credit and asset management, operations, and special services. D.I. No. 145, N.T. at 157-58.

[22] D.I. No. 148 ¶ 46.

[23] D.I. No. 145, N.T. at 160.

[24] *Id.*, N.T. at 20-21.

[25] *Id.* at 21-23.

[26] Joint Exhibit 10.

[27] D.I. No. 145, N.T. at 24-27; D.I. No. 146, N.T. at 270-71.

[28] Joint Exhibit 10 at 31.

[29] *Id.*

[30] D.I. No. 145, N.T. at 37–39; D.I. No. 146, N.T. at 74–75, 162.

[31] D.I. No. 145, N.T. at 37; D.I. No. 146, N.T. at 289–90.

[32] N.T. Deposition T. Wise at 50–51, 94.

[33] D.I. No. 145, N.T. at 35.

[34] *Id.*, N.T. at 33–35.

[35] D.I. No. 146, N.T. at 74–76, 162–63.

[36] D.I. No. 145, N.T. at 17-19; D.I. No. 146 at 87-88.

[37] D.I. No. 145, N.T. at 17–18, 161.

[38] D.I. No. 146, N.T. at 87-88.

[39] *Id.*, N.T. at 88.

[40] D.I. No. 145, N.T. at 19-20.

[41] *Id.*, N.T. at 163-64.

[42] *Id.*, N.T. at 164.

[43] *Id.*, N.T. at 165–66.

[44] Joint Exhibit 13; D.I. No. 145, N.T. at 167–68.

[45] Joint Exhibit 14; D.I. No. 145, N.T. at 169.

[46] D.I. No. 145, N.T. at 170.

[47] *Id.*, N.T. at 173–74.

[48] D.I. No. 146, N.T. at 107–08.

[49] *Id.*, N.T. at 114.

[50] *Id.* N.T. at 114–115, 117.

[51] Joint Exhibit 30; D.I. No. 145, N.T. at 39–42.

[52] Joint Exhibit 30.

[53] D.I. No. 145, N.T. at 201–02.

[54] *Id.*, N.T. at 54–55.

[55] Joint Exhibit 34.

[56] D.I. No. 145, N.T. at 49.

[57] Joint Exhibit 34.

[58] D.I. No. 145, N.T. at 50.

[59] *Id.*, N.T. at 51–52.

[60] *Id.*, N.T. at 55–56.

[61] Joint Exhibit 35.

[62] D.I. No. 145, N.T. at 56, 196.

[63] Joint Exhibit 35.

[64] D.I. No. 145, N.T. at 302.

[65] Joint Exhibit 40.

[66] D.I. No. 145, N.T. at 290–91.

[67] Joint Exhibit 40.

[68] D.I. No. 145, N.T.at 56–57, 211.

[69] *Id.*, N.T. at 304, 312.

[70] *Id.*, N.T. at 56–57.

[71] Joint Exhibit 41.

[72] Joint Exhibit 46.

[73] D.I. No. 145, N.T. at 287.

[74] *Id.*, N.T. at 322–23.

[75] D.I. No. 146, N.T. at 178; Joint Exhibit 44.

[76] D.I. No. 146, N.T. at 79.

[77] *Id.*, N.T. at 174–75.

[78]Blackstone's Roberts unknowingly emailed Ms. Magnani on August 20 to set a meeting. Joint Exhibit 41. Ms. Magnani did not respond in writing but called Blackstone's Roberts to decline interest in a Blackstone position. D.I. No. 145, N.T. at 326–27.

[79] D.I. No. 146, N.T. at 179–89.

---

[80] D.I. No. 146, N.T. at 181–83; Joint Exhibits 47, 34, 35.

[81] D.I. No. 146, N.T. at 165–66.

[82] *Id.*, N.T. at 200.

[83] Joint Exhibit 49.

[84] Joint Exhibit 49.

[85] Joint Exhibit 50; D.I. No. 146, N.T. at 191–92.

[86] D.I. No. 146, N.T. at 180.

[87] *Id.*, N.T.at 195. Mr. Miller denies being dishonest to TREA President Hunter during their August 18 conversation. Mr. Miller contends he did not "refer" Ms. Magnani to Blackstone, but rather simply forwarded her resume to Blackstone's Roberts in response to his request. Mr. Miller does not consider sending Ms. Magnani's resume to Blackstone in response to its request "referring" her and contends he never discussed Ms. Magnani's resume with TREA President Hunter during their August 18 phone call. D.I. No. 145, N.T. at 59–61. And Mr. Miller contends he voluntarily provided to TREA President Hunter the email exchanges with Mr. Roberts, undercutting the dishonesty accusation. D.I. No. 145, N.T. at 59–61; Joint Exhibits 47, 54.

[88] D.I. No. 146, N.T. at 204–05.

[89] *Id.*, N.T. at 204–05.

[90] Joint Exhibit 54.

[91] D.I. No. 146, N.T. at 212.

[92] *Id.*, N.T. at 208–10.

[93] Joint Exhibit 57 at 4.

[94] D.I. No. 146, N.T. at 206–07.

[95] *Id.*, N.T. at 207.

[96] Joint Exhibits 58, 59; D.I. No. 146, N.T. at 54, 212.

[97] D.I. No. 146, N.T. at 207–08.

[98] Joint Exhibit 59.

---

[99] *Id.*.

[100] *Id.* (emphasis added).

[101] *Id.* TREA President Hunter included the portion in the draft referring to a "for cause" termination and forfeiture of Mr. Miller's units under the Unit Agreements after speaking with CEO Ward.

[102] D.I. 146, N.T. at 71.

[103] *Id.*, N.T. at 119.

[104] *Id.*, N.T. at 66–67, 92.

[105] The Amended and Restated Limited Liability Company Agreement of Trimont Global ("Trimont Global LLC Agreement') vests its Board of Directors with the right to manage its business and the business of its subsidiaries through Board action. Joint Exhibit 1, Article 5. Three persons serve as Trimont Global's Board of Directors, including two Värde representatives and CEO Ward. The Board must approve certain specified actions by Trimont Global or any subsidiary, including approving the termination of any senior executive of Trimont Global or a subsidiary. Action by the Board must be taken by the affirmative vote of a majority of Directors present at a duly held meeting at the time the action is taken, except as expressly provided otherwise in the Trimont Global LLC Agreement. Regular meetings of the Board are held at times and places determined by the Chairman of the Board. The Board may hold special meetings called by any two Directors on at least forty-eight hours' notice to each Director. The Board may also act without a meeting if a written consent setting forth the Board action is signed by the Directors in the aggregate showing sufficient votes to approve the Board action at a meeting where all Directors were present subject to prior written notice to each director and non-voting observer of the Board unless waived. Board meetings may take place by telephone subject to notice of meeting requirements.

[106] D.I. No. 137-1, N.T.  J. Dunbar Deposition at 37–38.

[107] *Id.*, N.T. J. Dunbar Deposition at 60–61,78.

[108] *Id.*, N.T. J. Dunbar Deposition at 30–31, 49.

[109] *Id.*, N.T. J. Dunbar Deposition at 32, 54. Board Member Dunbar considered CEO Ward, TREA President Hunter, and Trimont Global's Chief Financial Officer Glen Peters part of the "executive management team." Board Member Dunbar believed Mr. Miller's forwarding of Ms. Magnani's resume to Blackstone "goes against the culture" of Trimont Global and "trust of management." *Id.*, N.T. J. Dunbar Deposition at 47, 53. But Mr. Dunbar did not know Ms. Magnani sent her resume to Blackstone's Roberts and did not know Ms. Magnani suggested her cousin Mr. Grosso's name for a position at Blackstone. *Id.*, N.T. J. Dunbar Deposition at 47–48.

[110] *Id.*, N.T. J. Dunbar Deposition at 47–49.

[111] *Id.*, N.T. J. Dunbar Deposition at 54–57.

[112] *Id.*, N.T. J. Dunbar Deposition at 66–68, 78.

[113] *Id.*, N.T. J. Dunbar Deposition at 69–70, 72, 78–79; Joint Exhibit 97.

[114] D.I. 137-1, N.T. J. Dunbar Deposition at 87.

[115] D.I. No. 146, N.T. at 93.

[116] D.I. No. 137-1, N.T. B. Schmidt Deposition at 50.

[117] *Id.*, N.T. B. Schmidt Deposition at 61–62.

[118] *Id.*, N.T. B. Schmidt Deposition at 77.

[119] *Id.*, N.T. B. Schmidt Deposition at 96.

[120]For example, CEO Ward twice verified responses to interrogatories identifying only himself as the person who made the decision to terminate Mr. Miller for cause notwithstanding his testimony the Board made the decision. *See* D.I. No. 146, N.T. at 96–100. CEO Ward distanced himself from his Verifications by explaining he "had nothing to do with this document …" and he is "not convinced this is [his] representation. This is a representation submitted by counsel." *Id.*, N.T. at 97–98.

[121] D.I. No. 146, N.T. at 224–25.

[122] Joint Exhibit 61. The enhanced reasons included Mr. Miller's sending of Ms. Magnani's resume to Mr. Roberts caused Ms. Magnani "great surprise and embarrassment"; Mr. Miller's "willful actions were extremely adverse to the interests of the company" and "undermined and embarrassed [Ms. Magnani] and put at risk the company's board approved strategic plan for the [Investment Advisory Services] business line and the future of the New York office"; "tarnished the company's reputation with the client"; if his actions "led to the departure of [Ms. Magnani], they would have significantly weakened the company and therefore adversely affected the majority shareholder's [Värde] investment in the company"; and when confronted by TREA President Hunter about his actions, Mr. Miller "[was] not forthcoming in disclosing [his] actions and made several comments that falsely implied [he] had not referred the individual to the client." These actions "have led to a loss of trust in your judgment and your commitment to the company."

[123] Joint Exhibit 61.

[124] D.I. No. 146, N.T. at 84.

[125] *Id.*, N.T. at 85.

[126] Joint Exhibit 61.

[127] Joint Exhibit 62 at 1.

[128] D.I. No. 149, § I.C., ¶ 90.

[129] D.I. No. 145, N.T. at 76, 80.

[130] *Id.*, N.T. at 80.

[131] Joint Exhibit 62 at 5; D.I. No. 146, N.T. at 235–36.

[132] D.I. No. 145, N.T. at 88.

[133] *Id.*

[134] Joint Exhibit 65.

[135] Joint Exhibit 65 at 2–3.

[136] D.I. No. 145, N.T. at 89.

[137] Joint Exhibit 64.

[138] D.I. No. 146, N.T. at 43.

[139] D.I. No. 145, N.T. at 91–92.

[140] Joint Exhibit 72.

[141] D.I. 146, N.T. at 38, 48.

[142] *Id.*, N.T. at 39.

[143] *Id.*, N.T. at 42.

[144] *Id.*.

[145] *Id.*,  N.T. at 41.

[146] D.I. No. 145, N.T. at 97.

[147] Joint Exhibit 73.

---

[148] *Id.*

[149] *Id.*

[150] *Id.*

[151] Joint Exhibit 76.

[152] *Id.*

[153] *Id.*

[154] CEO Ward swore (1) "I believe that the Plaintiff wasn't terminated for cause. He resigned. And he's trying to walk back on that resignation" (Doc. 146, N.T. at 51), but minutes later testified (2) "Plaintiff was terminated for cause and therefore would not have been entitle to receive" unit shares. D.I. No. 146, N.T. at 52.

[155] Joint Exhibit 77.

[156] D.I. No. 146, N.T. 60–61.

[157] Mr. Miller did not plead Trimont Global breached a duty of good faith and fair dealing implied in all contracts. Under Delaware law, there is an implied covenant of good faith and fair dealing in every contract and "requires a 'party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (further citation omitted)). To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege (1) a specific implied contractual obligation; (2) a breach of the obligation; and (3) resulting damage. *Id.* (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at * 1 (Del. Ch. Nov. 10, 1998)). The implied covenant has a "narrow purpose" and "only rarely invoked successfully." [157] *Id.* (citing *Superior Vision Servs, Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at * 6 (Del. Ch. Aug. 25, 2006)). It is a doctrine "by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement." *Allen v. El Paso Pipeline GP Co., LLC*, 113 A.3d 167, 179–84 (Del. Ch. 2014).

A claim for breach of the duty of good faith and fair dealing under Delaware Law cannot be premised on the express terms of the contract and the implied covenant "cannot be invoked to override the express terms of the contract." *Kuroda*, 971 A.2d at 888 (citing *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992)). It is not a "free floating duty imposed on a contracting party … [and] can only be used conservatively 'to ensure the parties' 'reasonable expectations' are fulfilled." *Id.* (quoting *Dunlap*, 878 A.2d at 442). Thus, while the implied covenant of good faith and fair dealing inheres in every contract under Delaware law, the duty "is triggered when the defendant's conduct does not violate the

express terms of the agreement but nevertheless deprives the plaintiff of the fruits of the bargain" and "is 'best understood as a judicial tool used to imply terms in a contract that protect the reasonable expectations of the parties to … the contract.'" *Amirsaleh v. Bd. of Trade of City of New York, Inc*., 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009) (further citation omitted).

[158] *See e.g.* Joint Exhibit 3 at ¶ 6.c.

[159] 2005 WL 406348 (Del. Super. Ct. Feb. 16, 2005).

[160] *Id.* at *2.

[161] *Id.* at *3.

[162] *Id.* at *4, n. 13 (collecting cases).

[163] D.I. No. 150, § II.6.

[164] *Id.*

[165] The Employee Retirement Income Security Act, 29 U.S.C. §1001, *et seq.* ("ERISA") applies to an "employee welfare benefit plan" and "welfare plan", as specifically defined by ERISA, to certain funds or programs established by an employer for its employees providing the employee plan participants and their beneficiaries with certain benefits such as health care benefits, accident, disability, death benefits and other benefits defined by the statute. *See* 29 U.S.C. § 1002. ERISA itself does not provide a judicial standard of review of an adverse denial of benefits determinations. If the ERISA plan's language – construed like a contract – grants discretion to the fiduciary who makes benefits decisions, a court will review the decision for an abuse of discretion under the "arbitrary and capricious" standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan language does not grant discretion, a court will review the decision de novo. *Id.*

[166] *See W.R. Berkley Corp. v. Niemela,* 2019 WL 5457689, at *6 (D. Del. Oct. 24, 2019) (applying bad faith standard to compensation committee's attempt to recapture value of stock units of former employee for violating restrictive covenant where stock unit agreement gave compensation committee discretion to determine whether former employee engaged in competitive action); *Perry v. Lee*, No. 19-17899, 2020 WL 3396805, at *5 (D.N.J. June 19, 2020) (applying Delaware law in granting motion to dismiss breach of contract claim for failing to allege bad faith by committee of the board in denying her right to stock) (quoting *Niemela,* 2019 WL 5457689, at *5); *Schaffart v. ONEOK, Inc*., 686 F.3d 461, 471 (8th Cir. 2012) (recognizing under Delaware law if a stock agreement vests a committee with final binding and conclusive authority to determine a participant's right to receive or retain benefits, the decision will not be second guessed by the court absent a showing of fraud or bad faith, but finding the decision of a senior vice president to deny plaintiffs benefits would not be given deference because senior vice president was not a member of the executive compensation committee vested with discretion) (quoting *W.R. Berkley Corp. v. Hall*, 2005 WL 406348, at *4 (Del. Super. Ct. Feb. 16, 2005)).

[167] Joint Exhibit 61.

[168] Joint Exhibit 76.

[169] D.I. No. 145, N.T. at 100–01.

[170] *Id.*, N.T. at 101.

[171] D.I. No. 146, N.T. at 60; *see also id.*, N.T. at 49 ("Mr. Miller was terminated for cause from TREA"); *Id.* at 60; *see also* Joint Exhibit 86 at 6, (Defendants' Answer to Plaintiff' Interrog. No. 6) ("Plaintiff refused to accept TREA's proposal that would have allowed him to continue his employment, *so his employment was terminated*.") (emphasis added).

[172] Joint Exhibits 3, 6, 7, ¶ 4.a.ii .

[173] *See* Joint Exhibits 3, 6, 7.

[174] D.I. No. 147, N.T. at 29–30.

[175] *Id.*, N.T. at 31.

[176] *Id.*, N.T. at 32, 37.

[177] *Id.*, N.T. at 32, 37–39.

[178] Joint Exhibit 104; D.I. No. 147, N.T. at 45.

[179] Joint Exhibit 103; D.I. No. 147, N.T. at 45.

[180] Joint Exhibit 103; D.I. No. 147, N.T. at 45–46.

[181] Joint Exhibit 111; D.I. No. 147, N.T. at 47–55.

[182] *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011); *Del. Tech. & Cmty. Coll. v. Emory Hill & Co.*, 116 A.3d 1243 (Table), 2015 WL 4094410, at *4 (Del. July 7, 2015); *CertiSign Holding, Inc. v. Kulikovsky*, 2018 WL 2938311, at *29 (Del. Ch. June 7, 2018).

[183] *Brandywine*, 34 A.3d at 486 (quoting *Moskowitz v. Mayor and Council of Wilmington*, 391 A.2d 209, 210 (Del. 1978)).

[184] *CertiSign Holding, Inc.*, 2018 WL 2938311, at *29 (quoting *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988)).

[185] *CertiSign Holding, Inc.*, 2018 WL 2938311, at *30.

---

[186] Del. Code Ann. tit. 6, § 2301(a).

[187] *CertiSign*, 2018 WL 2938311, at *29 (internal footnotes omitted) (first citing *BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*, 2017 WL 4151172, at *21 (Del. Ch. Sept. 19, 2017), then citing *ReCor Med., Inc. v. Warnking*, 2015 WL 535626, at *1 (Del. Ch. Jan. 30, 2015)).

[188] Joint Exhibits 3, 6, 7, § 9.a.

[189] *See The Discount Window and Discount Rate*, Federal Reserve, available at https://www.federalreserve.gov/monetarypolicy/discountrate.htm (last visited February 28, 2022).

[190] There are 505 days between October 11, 2020 and February 28, 2022. This is 1.38 years (505 days/365 days). Applying an interest rate of 5.25% to a period of 1.38 years results in $32,971.59 of accrued interest (a total of $483,618.59). *See* https://www.investor.gov/financial-tools-calculators/calculators/compound-interest-calculator (last visited February 28, 2022).

[191] Del. Code Ann. tit. 6, § 2301(a).

[192] *Noranda Aluminum Holding Corp. v. XL Ins. Am., Inc.*, 2021 WL 5961628, at *1 (Del. Dec. 16, 2021).

[193] *CertiSign*, 2018 WL 2938311, at *29.

[194] *See id.* (awarding post-judgment interest in breach of contract case calculated from date of judgment).

[195] D.I. No. 110.

[196] D.I. No. 117.

[197] D.I. No. 137.